UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TRACY BETTERS, | ) | |
|     *Plaintiff*, | ) | |
| | ) | |
|     *vs*. | ) | 1:12-cv-00538-JMS-MJD |
| | ) | |
| THE GEO GROUP, INC., | ) | |
|     *Defendant*. | ) | |

## ORDER

Presently before the Court in this action brought under Title VII of the Civil Rights Act is Defendant The GEO Group's ("GEO") Motion for Summary Judgment, [dkt. 57].

### I.
### STANDARD OF REVIEW

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence is unnecessary because, as a matter of law, it would conclude in the moving party's favor. *See* Fed. R. Civ. P. 56. To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a

fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially the grant of summary judgment. Fed. R. Civ. P. 56(e).

The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson v. Cambridge Indus.*, 325 F.3d 892, 898 (7th Cir. 2003). Furthermore, reliance on the pleadings or conclusory statements backed by inadmissible evidence is insufficient to create an issue of material fact on summary judgment. *Id*. at 901.

The key inquiry, then, is whether admissible evidence exists to support a plaintiff's claims or a defendant's affirmative defenses, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999). And when evaluating this inquiry, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial…against the moving party." *Celotex*, 477 U.S. at 330.

## II.
### BACKGROUND

The Court finds the following to be the undisputed facts, supported by admissible evidence:

### A. Ms. Betters' Hiring and Training

GEO is a private correctional management company which manages the New Castle Correctional Facility, located in New Castle, Indiana. [Dkt. 59-11 at 1, ¶¶ 3-5.] New Castle Correctional Facility houses convicted male sex offenders. [Dkt. 67-1 at 2, ¶ 2.] Ms. Betters worked as a correctional officer at the facility from March 23, 2009 to June 16, 2010. [Dkt. 59-11 at 2, ¶ 7.]

Specifically, she worked at the facility's out-patient medical unit and her job responsibilities included checking in inmates as they arrived for treatment. [Dkt. 17 at 2, ¶ 9.] When she was hired, Ms. Betters was assigned to a 12-hour shift. [Dkt. 59-13 at 11- 12.]

On the date that she began her employment, March 23, 2009, Ms. Betters signed documents which indicated that she received copies of all employment policies of GEO, including those related to sexual and workplace harassment. [Dkt. 59-11 at 5, ¶ 18.] She also signed forms that indicate that she viewed a training video entitled "Sexual Harassment: You Make the Call," and that she received: (1) additional documents relating to disciplinary policies and procedures; (2) a document relating to standards of employment; and (3) a copy of the Code of Ethics regarding the conduct of State Business. [*Id.*] During the course of her employment, Ms. Betters received more than 260 hours of training, which included segments on "sexual harassment, preventing sexual harassment, workplace harassment, reporting, handbook policies and procedures, and workplace violence." [*Id.* at 5, ¶ 19.]

### B. Incidents between Ms. Betters and Mr. Lambert in February 2010

On February 6, 2010, a male correctional officer working at the facility, Stephen Lambert, asked Ms. Betters to go to dinner with him. [Dkts. 17 at 2, ¶ 11; 67-1 at 2, ¶ 3.] Ms. Betters responded: "[n]o, I'm married, it's inappropriate and don't ask me again." [Dkt. 17 at 2, ¶ 12.] On February 8, 2010, Mr. Lambert again asked Ms. Betters to have dinner with him. [Dkts. 17 at 2, ¶ 13; 67-1 at 2, ¶ 4.] Ms. Betters again declined the invitation and reminded him that she was married and his offer was therefore inappropriate. [Dkt. 67-1 at 2, ¶ 4.] On February 10, 2010, Mr. Lambert asked Ms. Betters a third time to have dinner with him, adding words to the effect of "come on, your husband won't mind." [Dkts. 17 at 3, ¶ 15; 67-1 at 2, ¶ 5.] Ms. Betters again declined and told him that she would report him if he did not stop asking. [Dkt. 67-1 at 2,

¶ 5.] Ms. Betters stated that after these incidents occurred, and because she was "working in a jail full of convicted male sex offenders," she "became nervous and more vigilant because of [her] surroundings on the job." [*Id.* at 2, ¶ 6.] However, Ms. Betters did not report the February 2010 interactions with Mr. Lambert to anyone at GEO. [Dkt. 59-6 at 15-16.]

### C. Incidents between Ms. Betters and Mr. Lambert in May 2010

Ms. Betters and Mr. Lambert did not have any further conversations until May 2010. [*Id.* at 16-17.] On May 10 or May 15, 2010 Mr. Lambert called Ms. Betters while she was at her post in the facility and said something to the effect of: "[h]ey baby, I'm going to buy you a candy bar." [Dkts. 17 at 3, ¶ 17; 67-1 at 3, ¶ 10.][1] After the call, at around 8:00 or 9:00 p.m. that evening, Sergeant Dustin Patton approached Ms. Betters after he heard about the incident from Ms. Betters' coworker. [Dkt. 67-5 at 4.] Ms. Betters related the details of the incident to him. [*Id.*; dkt. 67-1 at 3, ¶ 11.] That evening, he reported the incident to and filed an incident report with Captain Roy Davis, the night shift supervisor who was working at the time. [Dkts. 67-4 at 2; 67-5 at 4; 67-6 at 2.]

On May 16, 2010, Ms. Betters was called into a meeting with Lieutenant Lori Wadeking and Cpt. Fred Mumpower. [Dkt. 67-1 at 3, ¶ 13.] Immediately after the meeting, Ms. Betters met with Lt. Wadeking and Captain Deaton to further discuss Mr. Lambert's actions. [*Id.* at 4, ¶ 14.]

Later in the afternoon on May 16, 2010, Cpt. Deaton and Lt. Wadeking called Mr. Lambert into a meeting regarding Ms. Betters' complaints. [Dkt. 59-10 at 9; 67-14 at 2.] Lt. Wadeking told Mr. Lambert that he was not to have any further contact with Ms. Betters, and Mr.

---

[1] Ms. Betters states this incident occurred on May 15, 2010 in her affidavit, [dkt. 67-1 at 3, ¶ 10], and her deposition, [dkt. 59-6 at 22], but she alleges it occurred on May 10 in her First Amended Complaint, [dkt. 17 at 3, ¶ 17].

Lambert responded that he understood the instructions.[2]  [Dkt. 59-10 at 10-11.]  Cpt. Deaton filled out the necessary paperwork and sent it to Human Resources.  [Dkt. 67-14 at 2.]

After the meeting with Cpt. Deaton, Ms. Betters returned to her shift with Mr. Lambert. [Dkt. 67-1 at 4, ¶ 17.]  Mr. Lambert called her on the phone at her post that afternoon, referred to her as "babe" and offered to buy her a candy bar.  [*Id*. at 4, ¶ 18.]  Ms. Betters alleges that because she was so emotional, sick, and anxious after this encounter with Mr. Lambert on the afternoon of May 16, 2010, Lt. Wadeking offered to and did escort Ms. Betters to her car at the end of her shift so Ms. Betters would feel safe.  [Dkt. 67-1 at 5, ¶ 19; 67-2 at 3.]

Ms. Betters alleges that after she complained about Mr. Lambert, her partner, Officer Westerman, was taken off Checkpoint C and transferred to another post.  [Dkt 67-1 at 5, ¶ 20.] She claims that before she complained about Mr. Lambert's actions, there was "frequently" an officer assigned to Checkpoint C.  [*Id.*]  Ms. Betters alleges that Checkpoint C is in close proximity to her work station, and consistent manning ensures the safety of the officers on duty. [Dkt. 17 at 4, ¶ 31.]  She alleges that after she complained about Mr. Lambert's actions, Checkpoint C was only manned two hours per day on average.  [*Id.* at 5, ¶ 32.]  However, the Checkpoint C logbooks indicate that the checkpoint was manned regularly during the majority of days that Ms. Betters worked in April, May, and June, with few exceptions.  [Dkts. 59-11 at 3-4, ¶¶ 11-13; 59-16, 59-20 to 59-22.]

On May 26, 2010, Ms. Betters alleges that Mr. Lambert "went out of his way" to walk past her five times while she was at her station, and stared at her in an intimidating manner.

---

[2] Lt. Wadeking told Mr. Lambert: "[i]f you see her coming down the hallway you are to turn around and go the other way.  You don't go to her area.  You don't call her.  There is no reason for you to call her.  If you see her outside of this place you are not to confront her.  You are not to call her on the phone.  You are to have absolutely no contact with Ms. Betters.  You are not to discuss this situation with anyone else."  [Dkt. 59-10 at 10-11.]

[Dkt. 67-1 at 5, ¶ 24.] On approximately May 31, 2010, Mr. Lambert lined up directly behind Ms. Betters as she was waiting to clock out at the end of her shift. [Dkts. 59-6 at 34; 67-1 at 5-6, ¶ 25.] There were roughly five people in front of Ms. Betters and at least one person behind Mr. Lambert in line. [Dkt. 59-6 at 35.] Ms. Betters claims that Mr. Lambert touched her hair while standing behind her. [Dkts. 59-6 at 34, 36; 67-1 at 5-6, ¶ 25.] Ms. Betters alleges that, as a result of this incident, she suffered another panic attack, during which she experienced symptoms such as shaking, vomiting, tearfulness, and anxiety. [Dkt. 67-1 at 6, ¶ 26.]

### D. Incidents between Ms. Betters and Mr. Lambert in June 2010

Ms. Betters was previously scheduled to take June 1 and 2, 2010 off from work, and called in sick on June 3 because she was "scared of returning…." [Dkt. 67-1 at 6, ¶ 27.] When she returned to work on June 4, Mr. Lambert told Ms. Betters as she was clocking out to "have a nice weekend" in what Ms. Betters alleges was a "sarcastic and intimidating manner." [*Id.* at 6, ¶ 28.] That same day, Ms. Betters told Sgt. Patton about this incident and the incident which occurred on May 31. [*Id.* at 6, ¶ 29.] Sgt. Patton requested that Ms. Betters fill out an incident report, which Ms. Betters did and which she gave to Sgt. Patton on June 12, 2010. [*Id.*] She alleges that she was not able to fill out the report until June 12 because there were no blank forms available in the Duty Office on June 4 when she checked, and she did not return to work thereafter until June 12 due to scheduling and some vacation days. [*Id.* at 6-7, ¶¶ 29-31.]

During her time away from work from June 5 through June 11, 2010, Ms. Betters saw a doctor for treatment for her panic attacks, which Ms. Betters alleges were the result of her fear of Mr. Lambert and her "supervisors' refusal to control his behavior." [*Id.* at 7, ¶ 32.] Her doctor prescribed a tranquilizer. [*Id.*] At various times on June 13 or 14, Mr. Lambert said "hi" to Ms. Betters and "smirked in an intimidating way." [*Id.* at 7-8, ¶ 36.] Ms. Betters submitted her writ-

ten resignation letter on June 16, 2010 because she was "continuing to be physically ill and suffering panic attacks with the thought of having to return to work with [Mr.] Lambert," among other complaints. [*Id.* at 8, ¶ 38; dkt. 67-8 at 2.][3]

### E. The EEOC Complaint and the Lawsuit

On March 7, 2011, Ms. Betters filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") in which she alleged that GEO constructively discharged her because it refused to take action against Mr. Lambert for sexually harassing her. [Dkt. 1-2 at 1.] Ms. Betters also alleged that GEO stopped assigning officers to Checkpoint C after she complained about Mr. Lambert's actions. [*Id.*] On January 25, 2012, the EEOC issued a Dismissal and Notice of Rights, finding that it was "unable to conclude that the information obtained establishes violations of the statutes." [Dkt. 1-1 at 1.]

Ms. Betters filed her Complaint in this matter on April 24, 2012, and the operative Amended Complaint on July 20, 2012. Ms. Betters titles her claims: (1) Violation of Title VII – Sex Discrimination, [dkt. 17 at 5, ¶¶ 33-40]; and (2) Violation of Title VII – Retaliation/Constructive Discharge, [*id.* at 5-6, ¶¶ 41-50].

### III.
### DISCUSSION

### A. Claims of Sex Discrimination Versus Sexual Harassment

Ms. Betters' Amended Complaint includes allegations of "sex discrimination," retaliation, and constructive discharge. [Dkt. 17 at 5.] Gender (or "sex") discrimination and sexual harassment are two distinct claims under Title VII, and the creation of a hostile work environ-

---

[3] Ms. Betters' letter of resignation also noted that she had been required to work twelve-hour shifts and sometimes had to work on days off. [Dkt. 67-8 at 2.] Further, she noted an incident where she alleges she was told by two supervisors that if she told any other officers that she had seen them with an informant in the medical department, she would be disciplined or possibly terminated. [*Id.*]

ment is a form of sexual harassment. *See Phelan v. Cook County*, 463 F.3d 773, 782-83 (7th Cir. 2006); *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007). Ms. Betters consistently conflates the two claims throughout her Amended Complaint, and also in her Response in Opposition to Defendant's Motion for Summary Judgment, [dkt. 66].

Under Title VII, a plaintiff may prove sex discrimination either directly or indirectly. *See Kampmier*, 472 F.3d at 939. Under the direct method, a plaintiff must establish "either an acknowledgement of discriminatory intent or circumstantial evidence that provides the basis for an inference of intentional discrimination." *Id.* (citing *Phelan*, 463 F.3d at 779). Though the most common way to prove discrimination under the direct method is through an "admission of discriminatory animus by the employer," *Phelan*, 463 F.3d at 779, a plaintiff can also succeed under the direct method by "constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Id.* (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)). Using the indirect method, a plaintiff must demonstrate that: (1) she was a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) her employer treated similarly situated employees outside of the class more favorably. *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005).

On the other hand, to establish a *prima facie* case of sexual harassment under Title VII, a plaintiff must show that "1) she was subjected to unwelcome harassment, 2) the harassment was based on her sex, 3) the harassment was sufficiently severe or pervasive so as to alter the condition of her employment and create a hostile or abusive atmosphere, and 4) there is a basis for employer liability." *Kampmier*, 472 F.3d at 940 (citing *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354-55 (7th Cir. 2002)).

Though Ms. Betters labels her first claim "sex discrimination," her description of the elements of that claim are most analogous to the elements of a sexual harassment – and specifically a hostile work environment – claim.  *See Kampmier*, 472 F.3d at 939-40.  Ms. Betters does not discuss any of the elements of a sex discrimination claim in her Amended Complaint.  [Dkt. 17.]  But in her response to GEO's Motion for Summary Judgment, she suddenly discusses the indirect and direct methods of proof for sex discrimination claims under a section entitled "The Substantive Law Regarding Hostile Work Environment."  [Dkt. 66 at 23-27.]  She then proceeds to use the terms "sex discrimination" and "hostile work environment" interchangeably.  [*Id.*]

Beyond Ms. Betters' decision to name her first claim "sex discrimination," she does not allege a claim for sex discrimination in her Amended Complaint.  *See* Fed. R. Civ. P. 8.  However, out of an abundance of caution, the Court will discuss her inability to meet her burden of proof for either a sexual harassment or a sex discrimination claim.

### B. Sexual Harassment Claim

GEO argues that Ms. Betters cannot establish a sexual harassment claim because she did not notify anyone at GEO of the February 2010 incidents, and the remaining incidents do not rise to the level of sexual harassment.  [Dkt. 58 at 12-13.]  Further, GEO argues that even if Ms. Betters could establish that Mr. Lambert sexually harassed her, she cannot establish that she was subject to a hostile work environment and GEO's responses to the alleged harassment were reasonable.  [*Id.* at 16-22.]

Ms. Betters responds that Mr. Lambert's conduct was severe and pervasive, that he sexually harassed her, and that the harassment unreasonably interfered with her work performance and caused a hostile work environment.  [Dkt. 66 at 16-19.]  Ms. Betters also asserts that GEO was negligent in addressing her complaints.  [*Id.* at 20.]

As discussed above, to establish a *prima facie* case of sexual harassment under Title VII, a plaintiff must show that "1) she was subjected to unwelcome harassment, 2) the harassment was based on her sex, 3) the harassment was sufficiently severe or pervasive so as to alter the condition of her employment and create a hostile or abusive atmosphere, and 4) there is a basis for employer liability." *Kampmier*, 472 F.3d at 940 (citing *Hall*, 276 F.3d at 354-55).  Even assuming the other three factors are met in this case, Ms. Betters has not shown through admissible evidence that the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment.

Though Ms. Betters labels the alleged harassment as "pervasive," [dkt. 66 at 16-18], her mere assertion that the incidents rise to the level of pervasiveness is not a sufficient stand-in for a legal argument to that end.  As GEO correctly points out, the threshold Ms. Betters must meet to prove sexual harassment in the workplace, as opposed to a "merely unpleasant working environment," is exceptionally high. *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430-31 (7th Cir. 1995).  "The concept of sexual harassment is designed to protect working women from the kind of male attentions that can make the workplace hellish for women." *Id.*  The working environment Ms. Betters has described simply does not rise to the level of being "hellish."

As GEO points out, [dkt. 58 at 15-16], *Baskerville* is particularly instructive here.  In *Baskerville*, a secretary alleged the following incidents, perpetrated by her manager:  (1) he called her "pretty girl"; (2) he grunted at her in a sexual manner when she wore a skirt to work; (3) when she commented that his office was hot, he replied "not until you stepped your foot in here"; (4) when "may I have your attention please" was broadcast over the speaker, he said to her "[y]ou know what that means, don't you? All pretty girls run around naked"; (5) he called her a "tilly," and when she asked him what it meant, he said he used the term to refer to all women; (6)

he told her that his wife told him he "better clean up [his] act" and "better think of [her] as Ms. Anita Hill"; (7) when she asked why he left an office party early, he replied that there were so many attractive women there that he "didn't want to lose control, so [he] thought [he'd] better leave"; (8) when she complained that his office was smoky from cigarette smoke, he replied "[o]h really? Were we dancing, like in a nightclub?"; and (9) when she asked him if he'd gotten his wife a Valentine's Day card, he replied that he had not but he should because he was lonely (his wife had not yet moved to live with him in Chicago) and all he had for company was his pillow; he then gestured with his hand to indicate masturbation. *Id.* at 430. The *Baskerville* court concluded that "no reasonable jury could find that [the manager's] remarks created a hostile working environment." *Id.* at 431.

At best, Ms. Betters has shown that: (1) Mr. Lambert called her to ask her out to dinner on three occasions; (2) Mr. Lambert asked her if she would like him to buy her a candy bar on two occasions; (3) Mr. Lambert said "have a nice weekend" and "hi" in what she considered to be an intimidating manner; and (4) Mr. Lambert stood behind her in line and touched her hair. These incidents do not come close to the level of severity or pervasiveness displayed in *Baskerville* or numerous other cases in which the Seventh Circuit Court of Appeals held that the offending conduct there did not even rise to the level of actionable sexual harassment under Title VII. *See, e.g. Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir. 1993) (alleged harasser asked plaintiff for dates, called her a "dumb blonde," put his hand on her shoulder several times, attempted to kiss her on multiple occasions, and placed "I love you" signs in her work area); *McPherson v. City of Waukegan*, 379 F.3d 430, 439 (7th Cir. 2004) (alleged harasser touched the plaintiff's breasts on multiple occasions, asked her what color bra she was wearing, and asked if he could "make a house call" when she called in sick). Therefore, having failed to prove that the

offending conduct was sufficiently severe or pervasive, Ms. Betters has failed to prove the elements of a *prima facie* case of sexual harassment.

### C.  Sex Discrimination Claim

The Court now turns to what it will generously consider Ms. Betters' allegations of sex discrimination. Both GEO and Ms. Betters do not separately address the sex discrimination claim, instead lumping their arguments in with their discussions of sexual harassment and hostile work environment.

Title VII makes unlawful all employment practices that "discriminate against any individual with respect to [ ] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). As discussed above, a plaintiff can prove discrimination either directly or indirectly. Because Ms. Betters makes no argument that she is proceeding under the indirect method, the Court will only discuss the direct method of proof.

To establish a *prima facie* case of discrimination under the direct method, the plaintiff must offer direct evidence of a discriminatory intent or a "'convincing mosaic' of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Silverman v. Bd. of Educ.,* 637 F.3d 729, 734 (7th Cir. 2011)(citations omitted). Under the "convincing mosaic" approach, a plaintiff may demonstrate any of three broad categories of circumstantial evidence which include: (1) "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn"; (2) that the employer "systematically treated other, similarly situated,…employees [outside of the protected class] better"; or (3) that the employee suffered an adverse employment action and the employ-

er's justification is pretextual." *Id.* Ms. Betters attempts to demonstrate the third – "evidence that the plaintiff suffered an adverse employment action and that the employer's justification is pretextual." *Id.*

### 1. *Adverse Employment Action*

The Seventh Circuit Court of Appeals has articulated three categories of adverse employment actions actionable under Title VII:

> (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004) (citations omitted).

While the Seventh Circuit Court of Appeals has "defined adverse employment actions 'quite broadly,' adverse actions must be materially adverse to be actionable, meaning more than a 'mere inconvenience or an alteration of job responsibilities.'" *Oest v. Illinois Dep't of Corrections*, 240 F.3d 605, 612 (7th Cir. 2001) (citation omitted). Ms. Betters argues that she suffered a "deteriorating work environment, which she was subjected to by virtue of GEO's 'do nothing' approach in response to her complaints of harassment." [Dkt. 66 at 25.] From what the Court can tell, Ms. Betters is attempting to argue that she suffered from a Category Three adverse employment action. The facts Ms. Betters sets forth, however, do not demonstrate actionable sexual harassment under Title VII, as the Court discussed above. Therefore, GEO's alleged "do nothing" approach in response to her complaints of harassment – where, as here, the harassment was not actionable under Title VII – cannot of itself constitute a "convincing mosaic" of evidence

sufficient to demonstrate intentional discrimination.[4] Ms. Betters has made no showing that as a result of reporting Mr. Lambert's offending conduct, "the conditions in which she work[ed] [were] changed in a way that subject[ed] her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment." *O'Neal*, 392 F.3d at 911. Therefore, as was the case with her sexual harassment claim, Ms. Betters' sex discrimination claim, to the extent she alleges that claim in the first place, fails as a matter of law.

### D. Retaliation/Constructive Discharge

In support of her second claim, titled Violation of Title VII – Retaliation/Constructive Discharge, Ms. Betters alleges that she engaged in protected activity when she notified her supervisors regarding Mr. Lambert's behavior, and that GEO retaliated against her by failing to place an officer at Checkpoint C, failing to enforce its directive to Mr. Lambert to not have any contact with her, and forcing her to quit. GEO argues that the logbook entries show that Checkpoint C was not always manned before she complained about Mr. Lambert, and was often manned after she complained. [Dkt. 58 at 23-25.] GEO also argues that Ms. Betters cannot show she was constructively discharged because she has not established a hostile work environment claim. [*Id.* at 22.] Ms. Betters does not respond to GEO's arguments regarding Checkpoint

---

[4] In any event, the Court finds that GEO's response to Ms. Betters' complaints was reasonable. Specifically, Ms. Betters did not report the February 2010 incidents at all, and when she reported the May 2010 call from Mr. Lambert regarding buying her a candy bar, the complaint went up the chain of command and a written report was submitted within twenty-four hours. Also within twenty-four hours, Ms. Betters met with her GEO supervisors and they, in turn, met with Mr. Lambert and told him not to have any further contact with Ms. Betters. When Ms. Betters reported the June 4, 2010 incident in which Mr. Lambert told her to "have a nice weekend," she filled out an incident report on her first day back at work after not being scheduled to work for some of those days and using vacation time for other days. Ms. Betters resigned just four days after filling out the last incident report. GEO handled Ms. Betters' complaints appropriately and, indeed, had little time to act on those complaints – Ms. Betters resigned just a month after her very first complaint, but did not work many of those days in between due to scheduling or vacation.

C, but rather focuses on her claim that she was constructively discharged due to conditions that were intolerable when viewed by a "reasonable woman in [her] shoes…." [Dkt. 66 at 27-30.]

### 1. *Constructive Discharge*

Ms. Betters' claim that she was constructively discharged also fails. "A constructive discharge constitutes an adverse employment action. It occurs when the plaintiff shows that [she] was forced to resign because [the plaintiff's] working conditions, from the standpoint of the reasonable employee, had become unbearable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (citation omitted). The Seventh Circuit Court of Appeals has recognized two types of constructive discharges: resignations from "alleged discriminatory harassment" and resignations to prevent impending termination. *Id.* Here, Ms. Betters only claims the first type of constructive discharge occurred, so the Court will not discuss the second. [Dkt. 66 at 29.]

The level of harassment required under the first branch of constructive discharge theory requires "working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress,…thereby allowing an employer to address a situation before it causes the employee to quit." *Chapin*, 621 F.3d at 679. The Court has already concluded that Ms. Betters' alleged sexual harassment does not rise to the level actionable under Title VII. It need not repeat that discussion here to display why Ms. Betters' claim of constructive discharge – which requires that an even higher standard be met – fails.[5]

---

[5] The Court rejects Ms. Betters' argument that an unemployment compensation Administrative Law Judge's finding that Ms. Betters was constructively discharged is "persuasive and supportive" of such a decision here. [Dkt. 66 at 30-31.] The Court is not bound by that decision and, in any event, Ms. Betters has not presented any concrete information regarding what evidence was presented during that proceeding or the proceeding's scope.

### 2. *Retaliation*

The range of conduct prohibited under the retaliation provision of Title VII is broader than the range of conduct prohibited under the discrimination provision. *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 67 (2006). However, the *Burlington Northern* Court noted that "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* The *Burlington Northern* Court held that, to sustain a claim of retaliation under Title VII, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id. (quoting Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). Therefore, Ms. Betters was "protected from any 'materially adverse' action on the part of her employer designed to deter [her] from engaging in protected activity." *Phelan*, 463 F.3d at 787.

An employee may use either direct or indirect methods of proof to establish a *prima facie* case of retaliation under Title VII. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008). Here, Ms. Betters appears to allege only the former, so the Court will not discuss the latter. [Dkt. 17 at 4.] Under the direct method, Ms. Betters must demonstrate that: (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two. *See Phelan*, 463 F.3d at 787.

Ms. Betters has failed to put forth any evidence of retaliation on the part of her employer, because she has failed to demonstrate that she suffered an adverse employment action. As the Court discussed in connection with her sex discrimination claim, Ms. Betters has not demonstrated that she suffered from any of the three general categories of materially adverse employment actions contemplated by the Seventh Circuit Court of Appeals. *See O'Neal*, 392 F.3d at

911.[6] The Court will not repeat that discussion here. Though the range of prohibited conduct is broader for retaliation claims than general sex discrimination claims, it does not extend to unsupported claims. Ms. Betters has not made any showing that as a result of reporting Mr. Lambert's offending conduct, "the conditions in which she work[ed] [were] changed in a way that subject[ed] her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment." *Id.* Nor has she shown that GEO failed to act on her complaints – it did not – or that even if there was a failure to act, it would have caused a reasonable employee to resign. The Court notes that Ms. Betters resigned only four days after filing her second complaint regarding Mr. Lambert, which does not support the conclusion that she experienced such horrible working conditions that a reasonable person would have felt there was no other choice but to quit. Therefore, Ms. Betters has not demonstrated the elements of a *prima facie* case of retaliation under Title VII.

## IV.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS** GEO's Motion for Summary Judgment, [dkt. 57]. Judgment will enter accordingly.

07/22/2013

                                                *[signature]*
                                                Hon. Jane Magnus-Stinson, Judge
                                                United States District Court
                                                Southern District of Indiana

---

[6] In her retaliation claim, Ms. Betters argues that "GEO retaliated against [her] by failing to properly man another check point where she worked…." [Dkt. 17 at 6, ¶ 45.] Not only has Ms. Betters failed to present any evidence that Checkpoint C was intentionally left unmanned, she also has not demonstrated that she was harmed as a result of the alleged intentional understaffing. This is fatal to her retaliation claim. *See Burlington Northern*, 548 U.S. at 67.

**Distribution via ECF only:**

Adam Garth Forrest
BOSTON BEVER KLINGE CROSS & CHIDESTER
aforrest@bbkcc.com

Tae K. Sture
STURE LEGAL SERVICES LLC
tae@sturelaw.com